UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CORINNE ASLEE CROSS, | ) | CASE NO. 5:17-cv-1888 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | THOMAS M. PARKER |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

## I.      Introduction

Plaintiff, Corinne Aslee Cross, seeks judicial review of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).

Because the ALJ's decision was not supported by substantial evidence, I recommend that the final decision of the Commissioner be VACATED and the matter be REMANDED for further proceedings.

## II.      Procedural History

Cross protectively filed an application for disability insurance benefits ("DIB") on February 14, 2014 alleging a disability onset date of February 11, 2014. (Tr. 21, 165)  The claim was denied initially (Tr. 65-79) and on reconsideration. (Tr. 80-97)  Cross requested a hearing on January 9, 2015.  (Tr. 108)

Administrative Law Judge ("ALJ") Jeffrey Raeber heard the case on May 17, 2016 (Tr. 42-64) and found Cross was not disabled in his June 9, 2016 decision.  (Tr. 18-35)  On July 5, 2017, the Appeals Council denied review, rendering the ALJ's decision final.  (Tr. 1-5)  Cross instituted this action to challenge the Commissioner's final decision.

## III.  Evidence

### A.  Personal, Educational and Vocational Evidence

Cross was born on November 20, 1975 and was 40 years old at the time of the hearing. (Tr. 165)  She had a high school education and was certified as a State Tested Nursing Assistant in July 1999.  (Tr. 48, 186)  She previously worked in a skilled nursing health facility.  (Tr. 186)

### B.  Evidence Related to Cross's Physical Limitations

On October 29, 2012, Cross saw Dr. Raymond W. Acus, M.D., an orthopedic physician. (Tr. 278-280, 284-287)  Cross reported pain over her whole body, in her right hip, both knees, above her right elbow, and in her left shoulder.  Her knees occasionally buckled and she felt that her right hip popped out of place when she was lying in bed.  (Tr. 278, 284)  Dr. Acus observed tenderness on palpation of her right trochanteric bursa and medial joint line tenderness in the right knee.  (Tr. 278)  She was diagnosed with right trochanteric bursitis and right medial knee pain of unknown etiology.  Dr. Acus administered an injection in her right trochanteric bursa and ordered an MRI of her right knee to rule out medial meniscus tear.  (Tr. 279)

Cross went to the emergency room on March 7, 2013 complaining of back and hip pain. Physical examination revealed pain to palpation across the low back and pain over both sacroiliac joints.  Cross was diagnosed with low back pain and bilateral sacroiliac joint pain.  (Tr. 362)

Cross had four appointments with Dr. Acus between March 29 and September 27, 2013. (Tr. 296-304, 309-312)  She reported back pain, hip pain and right knee pain.  (Tr. 296, 299-300, 303, 309, 311)  Cross had well-localized tenderness over both sacroiliac joints, mild midline low back pain, pain on palpation over both trochanteric bursas, pain on palpation of the iliac tibial bands below the trochanteric bursa at the mid-thigh level, medial and joint line tenderness in the right knee, pain with hyperextension of the right knee, an equivocal straight leg raise bilaterally, midline tenderness, and tenderness of the lumbosacral spine.  (Tr. 296, 303, 309, 311)  Dr. Acus observed that Cross was walking with a limp.  (Tr. 303)  He diagnosed bilateral sacroiliitis, bilateral trochanteric bursitis with some referred pain from the back, possible meniscal pathology of the right knee, mild patellar chondromalacia of the right knee, possible HNP or stenosis at the lumbosacral spine level and chronic low back pain with no identifiable surgical lesion.  (Tr. 297, 303, 309, 311)  Dr. Acus administered injections to Cross's left trochanteric bursa on March 29 and August 5, 2013.  (Tr. 297, 303)

X-rays of the left hip and pelvis on March 29, 2013 showed left hip trochanteric bursitis. (Tr. 294)

An MRI performed on August 9, 2013 showed a small knee joint effusion, mild to moderate patellar chondromalacia with some cartilage loss and fibrillation most pronounced along the medial patellar facet and femoral trochlear apex, and low grade partial-thickness tear of the origin of the medial head gastrocnemius along the medial femoral condyle thought to likely represent  more chronic finding but with slight osseous edema underlying the origin, which could have been degenerative or representative of subtle stress changes.  (Tr. 305-306)

An MRI performed on August 23, 2013 showed mild degenerative disc disease at L3-4 and mild spinal stenosis with mild neural foraminal narrowing due to a bulging disc.  (Tr. 307)

3

Cross saw Jeffrey Tharp, D.O., on October 10, 2013 complaining of pain in her low back, mid back, and lateral thighs, worse in her left.  She reported that pain was worse with sitting, standing, walking, bending and general activity.  (Tr. 318)  Dr. Tharp observed normal gait, good strength in heel-to-toe walking, and good coordination.  Physical examination showed no pain upon palpation of the shoulders, cervical, thoracic or lumbar spine or the sciatic notch.  However, there was tenderness related to bilateral trochanteric bursitis and pain with forward flexion at the waist.  Cross had full strength in all extremities, intact sensation in all extremities, negative straight leg raise, and good range of motion of the shoulders, elbows, wrists, hips, knees and ankles without pain. (Tr. 319)  Dr. Tharp diagnosed lumbar disc disease, degenerative arthritis of the lumbar spine, and lumbar stenosis.  (Tr. 319-320)

Cross saw rheumatologist Nikita Hedge, M.D. on December 13, 2013, January 3, 2014, and March 10, 2014.  (Tr. 325-338)  Cross complained of generalized pain, right shoulder pain, right-sided neck pain, low back pain which radiated into the buttocks and down the left leg, hip pain and popping, muscle weakness, morning stiffness that lasted three hours, numbness and cramping in her fingers, popping of her elbow, cramping behind her knees, and problems sleeping.  (Tr. 325-327, 331-332, 335-336)  Physical examination showed tenderness in the spine, hips, mild tenderness in the right knee and ten positive fibromyalgia points.  (Tr. 327, 333, 377)  Dr. Hedge diagnosed ankylosing spondylosis, bilateral trochanteric bursitis, mild degenerative arthritis of the lower lumbar spine, numbness and tingling of the hands due to possible carpal tunnel syndrome, and generalized pain due to fibromyalgia.  (Tr. 328-329, 334, 337-338)  She noted that Cross had recently begun a new medication and recommended waiting at least three months to see if the medication helped.  She did not believe that Cross was disabled

because he felt that she would respond to treatment for ankylosing spondylitis and that staying active and medication would address her pain from fibromyalgia. (Tr. 329)

Dr. Hedge completed a form in which she stated that Cross's pain was not customarily seen in association with her conditions. She wrote that Cross's pain was out of proportion with her conditions of fibromyalgia and ankylosing spondylitis. She stated that Cross had no muscle weakness, no sensory deficits and no limitation of motion in the joints or spine. However, she thought that Cross's gross manipulation ability may be limited by pain. She also wrote that Cross had recently started a prescription and expected relief to begin in three months. (Tr. 323)

A December 17, 2013 MRI showed mild to moderate central edema along the inferior margin of each sacroiliac joint and extending slightly caudal, which could have been indicative of early sacroiliitis. (Tr. 352)

On March 21, 2014, Cross saw Atul Goswami, M.D., a primary care physician specializing in internal medicine. Cross reported pain in her neck, front chest, rib area, back and hips. Dr. Goswami diagnosed ankylosing spondylitis, fibromyalgia, and an upper respiratory infection. (Tr. 349)

Dr. Goswami completed a questionnaire on March 31, 2014 stating that Cross had been diagnosed with ankylosing spondylitis, fibromyalgia, and sacroiliitis; suffered from back pain, neck pain, hip pain, and rib pain; was compliant with treatment; was unable to return to work; could sit two hours at a time, stand one hour at a time, and had limitations in her ability to walk, and was unable to bend, stoop, lift, or grasp. (Tr. 346-348)

On May 5, 2014, Cross saw Dr. Hedge complaining of pain in her shoulder, hip, neck, back radiating into her buttocks, muscle weakness and morning stiffness lasting two to three hours. (Tr. 369) Cross told Dr. Hedge that she was continuing to work out three times a week.

5

Physical examination showed joint tenderness, spinal tenderness, sacroiliac joint tenderness, mild tenderness of the right anserine bursa, and the presence of fibromyalgia tender points.  (Tr. 371)  The diagnoses remained the same as previous appointments, with the addition of right anserine bursitis.  (Tr. 373)

On May 9, 2014, Cross again saw Dr. Goswami complaining of all over body pain and poor sleep.  Dr. Goswami diagnosed insomnia, depression, fibromyalgia and ankylosing spondylitis.  (Tr. 437)

Cross also saw a physician's assistant for Arsal Ahmad, M.D., a pain and rehabilitation specialist, on May 9, 2014.  Cross reported pain in her hip, knee, neck, low back radiating into her left lower extremity, and her whole body.  She had numbness in her toes on the left foot and occasional shooting pain into her leg.  Her pain worsened with activity including walking, lifting, standing, sitting and lying down.  (Tr. 623-627)  Physical examination showed tenderness to palpation of the mid-cervical spinous processes, diffuse tenderness to palpation over the thoracic paraspinous and spinous processes, flattening of the normal lumbar lordosis, pain throughout the lumbar spine and paraspinals, normal gait, normal balance, pain but normal range of motion in the lumbar spine, normal strength and 11 out of 18 tender points.  (Tr. 624-626)  Dr. Ahmad diagnosed unspecified myalgia and myositis, unspecified backache, disturbance of skin sensation, and ankylosing spondylitis.  Dr. Ahmad started Lyrica and ordered electrodiagnostic testing of Cross's left lower extremity.  (Tr. 626)

On May 13, 2014, an EMG study of Cross's left lower extremity returned findings consistent with acute left S1 radiculopathy.  (Tr. 619-622)

Cross went to the ER on May 17, 2014, complaining of leg and neck discomfort.  (Tr. 392-405)  She had mild tenderness to palpation of the left trapezius and was diagnosed with left-sided trapezius neck pain.  (Tr. 392-393)

Cross received trigger point injections from Dr. Ahmad on May 20 and August 17, 2014. (Tr. 601, 617-18)  Between June 3 and December 22, 2014, Cross had nine appointments with Dr. Ahmad.  (Tr. 568-572, 575-584, 588-616)  Cross complained of general body pain, neck pain, back pain with radiation, hip pain, shoulder pain, intermittent numbness and tingling in the left lower extremity and fingers, numbness and tingling in the right hand, weight gain, and headaches.  (Tr. 568-569, 575-576, 580-581, 588-589, 591, 593-594, 598-599, 603-604, 608-609, 612-613)  Physical examination showed tenderness over the cervical spine, flattening of the normal lumbar lordosis, tenderness to palpation in the thoracic and lumbar spine, positive Gillet's test and at least 11 out of 18 tender points, diffuse tenderness to palpation in the right shoulder, pain with motion of the right shoulder in all directions, and myospasms in bilateral gluteus maximus and lower lumbar paraspinals.  (Tr. 569-570, 576-577, 581-582, 589-590, 594, 595, 599-600, 504-605, 609-610, 613-614)  Plaintiff was encouraged to stay active and exercise. (Tr. 557, 566, 571, 583, 591, 596, 601, 606, 611, 615, 717, 724, 733, 740, 747, 751, 763, 772)

Cross saw rheumatologist Carlos E. Zevallos, Jr., D.O., on August 8, 2014.  (Tr. 452-461) Cross complained of pain in her neck, lower back, hips, knees and shoulders; parasthesias in bilateral hands; feeling like her hands were falling asleep; numbness and tingling in bilateral feet; feeling like she needs to stay in bed all the time; muscle weakness; headaches; and depression. (Tr. 452)  Physical examination showed tenderness in the shoulders with end range of motion and abduction as well as internal/external rotation; cervical, lumbar, and thoracic paraspinal muscle tenderness; and abnormal reflexes.  Dr. Zevallos noted normal muscle strength, normal

sensation and normal gait.  (Tr. 454-456, 460)  Dr. Zevallos diagnosed arthralgia, myalgia, fatigue, bone pain, and cervical pain.  (Tr. 456, 460)  His assessment included the following statements: "At this time I do not find evidence for an ongoing inflammatory process.  I do not see that an underlying connective tissue disease or inflammatory arthritis as [*sic*] the cause of her symptoms.  MRI of the cervical spine does not appear to explain her symptoms."  (Tr. 460)

An MRI on August 13, 2014 showed a right posterior disk protrusion at C6-7 with mass effect on the right ventral portion of the thecal sac and slight deformity of the right ventral portion of the spinal cord; and right posterior spur/disk complex at C3-4 slightly effacing the right ventral portion of the thecal sac.  (Tr. 428-429)  A whole body scan performed on August 14, 2014 showed minimal increased activity in the knees, suggestive of mild degenerative disease.  (Tr. 426)

On August 28, 2014, Cross complained to Dr. Goswami that she "doesn't get out of bed due to depression [and] pain" from head to toe.  (Tr. 436)  She met with him four times between August 28 and December 18, 2014 complaining of pain, spasms, numbness in her arms and sleeping problems.  (Tr. 436, 510-512)  Dr. Goswami prescribed a handicap placard on October 3, 2014.  (Tr. 511)

Cross met with another neurologist, Amir C. Mazhari, M.D., on October 7, November 18, and December 4, 2014.  (Tr. 499-503, 505-507)  She complained of pain all over her body, dizziness, paresthesia, numbness and tingling in her hands, and problems sleeping.  (Tr. 499, 502, 505-506)  Physical examination showed normal muscle strength and power, with some limitations in strength testing of the extremities due to pain, exaggerated deep tendon reflexes in the upper and lower extremities, and subjective decrease in sensation noted distally in the ulnar dermatomes.  (Tr. 499, 506)  Cross had normal coordination, intact sensation, and normal but

hesitant gait. (Tr. 506) Dr. Mazhari diagnosed paresthesia, carpal tunnel syndrome, dizziness and neck pain. (Tr. 499, 502, 5050) An electromyogram/nerve study on November 18, 2014 returned findings suggestive of bilateral carpal tunnel syndrome. (Tr. 502)

Cross received intravenous Lidocaine on October 16 and November 24, 2014. (Tr. 573-574, 585, 587)

An MRI on November 4, 2014 was overall normal with a small punctate white matter hypersensitivity in the subcortical left parietal lobe, which was nonspecific and likely of doubtful clinical significance. (Tr. 504)

Cross saw another rheumatologist, Qingping Yao, M.D., on December 16, 2014. (Tr. 531-538) Cross complained of pain all over her body and specifically her hip, low back and neck. (Tr. 531) She also reported bilateral carpal tunnel syndrome, numbness and tingling of the fingers, morning stiffness, feelings of depression, insomnia, and a change in interest. (Tr. 531) Physical examination showed tenderness of the neck and chest, generalized tenderness, and six out of 18 fibromyalgia tender points. Cross had normal range of motion in her neck, normal range of motion in her spine and extremities and intact sensation. (Tr. 533) Dr. Yao diagnosed fibromyalgia and chronic pain syndrome. (Tr. 533) He discussed fibromyalgia with Cross and recommended aerobic exercise. (Tr. 534-535)

Cross saw Dr. Goswami six times between January 19, and December 1, 2015. Cross reported depression, suicidal thoughts, problems sleeping, carpal tunnel syndrome, numbness, low back pain, neck pain, and gastrointestinal issues. (Tr. 509, 699, 701, 707, 709, 824) Dr. Goswami prescribed a handicap placard (again) on September 17, 2015. (Tr. 699)

Cross saw Dr. Ahmad nine times from January 22 and November 18, 2015. (Tr. 554-558, 563-567, 714-718, 721-725, 729-733, 737, 741, 744-748, 760-764, 769-773) Cross

complained of neck pain, headaches, low back pain, and pain all over her body.  (Tr. 554-555, 563-564, 714-715, 721-722, 729-730, 737-738, 744-745, 760-761, 769-770)  Physical examination showed tenderness throughout the cervical, thoracic, and lumbar spine regions; mildly restricted motion of the neck; flattening of the normal lumbar lordosis; diffuse tenderness to palpation of the right shoulder; pain with motion of the right shoulder; at least 11 out of 18 fibromyalgia tender points; and somewhat depressed mood.  (Tr. 555-556, 565-566, 716-717, 722-724, 731-732, 739-740, 745-746, 761-763, 771-772)  Dr. Ahmad sent a letter to Cross on November 24, 2015 stating that she was being discharged as a patient because she had tested positive for Nucynta when she was not supposed to be taking it.  (Tr. 779)  Cross submitted a statement explaining that she told Dr. Ahmad that she took Nucynta prior to her appointment and before the toxicology test.  (Tr. 780-781)

Cross saw William D. Lanzinger, M.D., an orthopedic and hand surgeon, on January 23, 2015.  She complained of numbness and tingling in both hands.  (Tr. 695)  Dr. Lanzinger observed positive Tinel's and Phalen's signs in both hands.  (Tr. 695)  Dr. Lanzinger recommended carpal tunnel release surgeries.  He performed the left carpal tunnel release on March 19, 2015.  (Tr. 692-693)  Cross saw Dr. Lanzinger for follow-up on March 30, 2015.  (Tr. 691)  Cross underwent a right carpal tunnel release on April 23, 2015.  (Tr. 689-690)

Cross received intravenous Lidocaine ten times between January 29 and November 10, 2015.  (Tr. 559-562, 719-720, 726-727, 734-735, 742-743, 753-754, 765-768, 774-775)  Cross saw a chiropractor on April 8, 2015.  (Tr. 684-687)  Cross complained of pain in her neck, shoulder, arm, mid back, low back, and legs.  (Tr. 684-687)  The chiropractor noted a positive straight leg test on the right.  (Tr. 687)

Cross went to the emergency department on May 14, 2015 complaining of a flare up of her fibromyalgia with all over body pain that was worst in her legs. (Tr. 702-705) Cross was diagnosed with acute on chronic pain and fibromyalgia. (Tr. 704) She was prescribed steroid medication and given an injection for pain. (Tr. 703)

Cross saw Ali Shakir, M.D., on June 19 and July 30, 2015 for low back pain radiating into her hips, legs, and feet, and neck pain that radiated down both shoulders and arms. (Tr. 749-752, 755-759) Dr. Shakir observed mildly restricted range of motion of the neck, antalgic gait, back pain proved by heel walk, tenderness throughout the cervical and lumbar spine, tenderness to both sacroiliac joints, positive Faber test, and a somewhat depressed mood. (Tr. 758) Cross underwent a lumbar transforaminal epidural steroid injection on July 30, 2015. (Tr. 750-751)

On December 22, 2015, Cross saw Patrick J. McIntyre, M.D., a pain management specialist. (Tr. 813-819) Cross complained of back pain, radiation of pain to both arms, calves and thighs; occasional numbness and tingling in her hands and toes; neck pain; muscle weakness; joint pain and stiffness; fatigue; weight gain; headaches; memory problems; depression; problems sleeping; stress; and nervousness. (Tr. 813, 815) Observations from a physical examination included restricted and painful range of motion of the cervical spine, tenderness of the cervical spine, positive axial compression and bilateral Spurling's test, painful sacroiliac joints, antalgic gait, tenderness of the lumbar spine, and limited and painful range of motion of the lumbar spine. (Tr. 816-817)

Cross went to the ER again on December 28, 2015 complaining of back, arm and leg pain. (Tr. 822-823) Cross was discharged with a prescription for Flexeril. (Tr. 823)

Between December 30, 2015 and February 18, 2016, Cross had five chiropractic treatment sessions with Matthew P. Martin, D.C., for fibromyalgia, myalgia, and chronic

nonmalignant pain.  (Tr. 783-812)  Plaintiff reported that her pain was unchanged.  Examination showed tenderness and limitation of motion in the lumber spine, but normal strength in all extremities.  (Tr. 783-806)

Progress notes from follow-up visits with Dr. Goswami on February 16 and April 29, 2016 show complaints of migraines with sensitivity to light and noise and diagnoses of fibromyalgia, migraines, back pain, and irritable bowel syndrome.  (Tr. 821, 844)

### C.    Evidence Related to Cross's Mental Impairments

On May 29, 1993, Akron Public Schools' records show that Melodie Phillips, M.D., had diagnosed Cross with post traumatic stress disorder ("PTSD"), depression and suicidal gesture manifested by anxiety.  (Tr. 261)  The report also documents that Cross was in the psychiatric unit in January 1993, had a history of sexual abuse and suicide attempts, and was unable to attend school.  (Tr. 261-263, 269-270)

### D.    Opinion Evidence

#### 1.    Treating Doctor – Atul Goswami, M.D., August 2014

Dr. Goswami completed a questionnaire on August 31, 2014.  Dr. Goswami opined that Cross could sit and/or stand for two hours of an eight-hour workday, with a break every 30 minutes; that she could walk one hour of an eight-hour workday, with a break every 10 minutes; and that she was unable to bend, stoop, lift or grasp.  (Tr. 433-435)

Dr. Goswami completed a fibromyalgia medical source statement on January 20, 2015. (Tr. 524-526)  Dr. Goswami listed Cross's symptoms as multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, numbness and tingling, anxiety, panic attacks, depression and carpal tunnel syndrome.  (Tr. 524)  He noted that stress, fatigue, and movement/overuse precipitated Cross's pain. (Tr. 524)  He opined that Cross

could lift a maximum amount of five pounds; could never climb, stoop, crouch, kneel or crawl; could occasionally or never balance; and was limited in her ability to reach, handle, feel, and push/pull. (Tr. 524-525) Dr. Goswami opined that Cross would need to take an unscheduled break more than four times per day, could use bilateral handle and fingers only 10 percent of the workday, could use bilateral arms only 25 percent of the workday to reach in front of her body and only 20 percent of the day to reach overhead, was likely to be off task 25 percent or more of the workday, was incapable of even "low stress" work, and was likely to miss more than four days of work per months. (Tr. 525-526)

Dr. Goswami also completed another questionnaire on January 20, 2015. (Tr. 527-528) This form contained much of the same information as the fibromyalgia statement he completed the same day. In addition to the limitations already expressed, Dr. Goswami opined that Cross could sit without interruption 15 minutes at a time for a total of 4 hours in an 8-hour workday. She could stand or walk for 4 hours total with 10 minute break every hour. He also stated that Cross would likely need to lie down two hours or more throughout the course of an 8 hour workday. (Tr. 527-528)

Dr. Goswami completed another questionnaire on March 29, 2016. (Tr. 842-843) He felt that Cross could lift "about a gallon of milk" occasionally but was unable to lift frequently; that she could sit for 10 minutes at a time for a total of 1 hour during an 8-hour workday; could stand/walk for 5-10 minutes at a time for a total of 1 hour in an 8-hour workday; could never climb, balance, stoop, crouch, kneel, or crawl, and was unable to work in noisy environments. (Tr. 842) He believed that Cross would be off-task over 20% of a workday, would be absent more than four days per month, and would need to lie down at least 2 hours in an 8-hour workday. He felt that she could use her hands 10% of the workday and would need more than

13

four unscheduled breaks a day.  Dr. Goswami wrote that Cross was "unable to do any employment at this time."  (Tr. 843)

### 2.  Treating Counselor – Jill Jividen, M.Ed., LPCC-S – September – November 2014

Cross's counselor, Jill Jividen, wrote three letters in September and November 2014 regarding Cross's mental health impairments and the treatment she was receiving.  (Tr. 465-467, 495, 496-497)  These letters stated that Cross had been treating with Ms. Jividen for more than three months.  Ms. Jividen had used Dr. Amen's checklist to assess Cross's behavioral symptoms and the areas of her brain that may have been affecting her symptoms.  (Tr. 496)  The results from the Amen Adult General Symptom Checklist suggested the following diagnoses:  major depression, panic disorder, social phobia, obsessive compulsive disorder ("OCD"), PTSD, general anxiety, adult ADHD, and thyroid abnormalities.  (Tr. 495)  Ms. Jividen also provided information regarding her methods and the results of Cross's checklist.  (Tr. 474-479)  In her November 15, 2014 letter, Dr. Jividen stated that Cross was stuck in an automatic immobilization response, or "the freeze."  (Tr. 465)  Ms. Jividen explained how research supported the correlation between the body's physical response to a trauma victim's prolonged perception of fear, chronic pain and other illnesses.  (Tr. 465-466)  Dr. Jividen stated that no one deserved disability more than Cross.  (Tr. 466)

Ms. Jividen completed a questionnaire on November 15, 2014.  (Tr. 470-473)  Ms. Jividen listed Cross's diagnoses as PTSD, major depressive disorder, obsessive compulsive disorder, generalized anxiety disorder, and panic disorder.  Ms. Jividen stated that Cross suffered from symptoms of chronic pain, depression, and anxiety.  (T4. 471)  She also stated that Cross was compliant with medications.  (Tr. 472)

14

Ms. Jividen completed a medical source assessment on April 26, 2015.  (Tr. 628-629)

She opined that Cross would not be able to perform 20 out of 20 of the designated tasks or

functions under the categories of understanding and memory, sustained concentration and

persistence, social interaction, and adaptation on a regular, reliable, and sustained schedule.  (Tr.

628-629)  Ms. Jividen further indicated that Cross was likely to miss more than four days of

work per month if she attempted to work full-time.  (Tr. 629)  Ms. Jividen wrote two more letters

explaining the effect of trauma and that Cross was in a fear body.  (Tr. 221-222, 631-632)

Ms. Jividen wrote another letter on November 16, 2015 stating that Cross has been

receiving mental health treatment an average of two times per week and that she felt confident

that Cross was not trying to take advantage of the Social Security disability system and deserved

disability benefits.  (Tr. 776-778)

Ms. Jividen authored another letter on March 14, 2016 stating that Cross continued to

receive mental health treatment an average of two times per week.  (Tr. 831-836)  Ms. Jividen

detailed Cross's progress in therapy but stated that the progress was made in a controlled

environment and did not include environments where there might be unpredictability or change.

(Tr. 832-833)

On March 17, 2016, Ms. Jividen completed a mental medical source assessment.  (Tr.

839-841)  She indicated that Cross was able to perform 14 out of 20 designated tasks or

functions, but had or would have noticeable difficulty more than 20 percent of the workday or

workweek; was not able to perform six out of 20 designated tasks or functions on a regular,

reliable and sustained schedule; was likely to miss more than four days of work per month; was

likely to be off task over 20 percent of a workday; and was likely to require unscheduled breaks

more than four times a day.  (Tr. 839-841)

### 3.     Consulting Psychologist – Joshua Magleby, Ph.D., June 2014

On June 10, 2014, Cross met with Joshua, Magleby, Ph.D., for a psychological evaluation.  (Tr. 407-413)  Cross reported a history of sexual abuse as well as physical and emotional abuse by her brother throughout her childhood, a history of difficulty in school, a very depressed mood, sitting at home most of the time, feeling low about herself, a history of suicide attempts, memory problems, weight gain, poor energy and fatigue.  (Tr. 408-409)  Cross also stated that her daily routine was "fairly normal" and that she continued to swim for physical activity.  (Tr. 409)  Mental status examination demonstrated normal affect and congruent mood with no evidence of affective instability despite Cross's report of being very depressed and no overt signs of anxiety.  (Tr. 410)  Dr. Magleby diagnosed recurrent, moderate major depressive disorder and unspecified adjustment disorder.  (Tr. 411)  He opined that plaintiff's ability to understand, remember, and carry out simple instructions was similar to others of the same age, despite her somewhat impaired memory.  He opined that Cross's ability to maintain attention and concentration appeared average and her social interaction was appropriate.  He felt that Cross's short-term memory, her ability to perform multistep tasks and her ability to handle mental stress with day-to-day work was "somewhat impaired" due to depression, sleep problems, and short-term recall problems.  (Tr. 412)

### 4.     Consulting Physical Therapist – Karin Kleppel, PT, March 2015

Cross underwent a functional capacity evaluation by Karin Kleppel, a physical therapist, on March 3, 2015.  (Tr. 539-52)  Ms. Kleppel opined that Cross could sit for 35 minutes at a time and stand/walk for 18.5 minutes at a time, limited by the length of the testing.  (Tr. 540)  She could lift or carry less than 10 pounds frequently and occasionally; she had difficulty climbing stairs and fine motor skills.  (Tr. 540)  Ms. Kleppel concluded that Cross tested in the sedentary range, but had increased pain with lifting.  (Tr. 541)  Ms. Kleppel also indicated that Cross

16

exhibited less than maximum effort on her testing; her reports of arm and leg pain did not follow any anatomical pattern; and she demonstrated inconsistent movement and strength patterns on different tests.  (Tr. 550-551)  Ms. Kleppel observed that Cross's reported abilities to sit, stand, and walk were less than observed tolerances during the examination.  (Tr. 551)

### 5.  Reviewing Physician – Anne Prosperi, D.O. – April 2014

On April 11, 2014, state agency reviewing physician Anne Prosperi, D.O., reviewed Cross's records and opined that she could lift 20 pounds occasionally and 10 pounds frequently; could sit, stand and/or walk for 6 hours in an 8-hour workday; could frequently stoop, kneel, crouch, crawl, and climb ramps and stairs; and could occasionally climb ladders, ropes and scaffolding.  (Tr. 74)

### 6.  Reviewing Physician – Michael Lehv, M.D., – December 2014

Michael Lehv, M.D., reviewed Cross's records on December 8, 2014.  (Tr. 88-91)  For the most part, Dr. Lehv affirmed the opinions of Dr. Prosperi.  In addition, he opined that Cross should avoid all exposure to hazards such as machinery or heights.  (Tr. 91)

### 7.  Reviewing Psychologist – David Demuth, M.D., – June 2014

On June 20, 2014, David Demuth, M.D., a state agency psychological consultant, reviewed Cross's file and opined that her affective disorder resulted in mild limitations of activities of daily living; no difficulties in social functioning; moderate limitations of concentration, persistence, or pace; and no episodes of decompensation.  (Tr. 71)  He felt that Cross had moderate limitations with regard to detailed instructions and pace and would do best performing one-to-four step routine work tasks.  (Tr. 75)  He also indicated that Cross would have moderate limitations with regard to responding to work changes, but could perform relatively static work with few changes that were easily explained.  (Tr. 76)

8.      **Reviewing Psychologist – Paul Tangeman, Ph.D., December 2014**

On December 16, 2014, Paul Tangeman, Ph.D., a state agency psychological consultant, reviewed Cross's records and affirmed the opinions of Dr. Demuth.  (Tr. 87-88, 92-93)

E.      **Testimonial Evidence**

1.      **Cross's Testimony**

A summary of Cross's testimony follows:

- Cross was 40 years old at the time of the hearing.  (Tr. 44)

- Cross previously worked as a nursing assistant.  She was required to lift patients and help them do activities.  (Tr. 46)

- Her last day of work was in February of 2014.  She stopped working because of pain that made it difficult to do her job.  (Tr. 46)

- She was living with her husband and fifteen year old son.  (Tr. 46)

- Cross was able to drive, but it was difficult.  (Tr. 47)

- During the day, Cross watched TV, relaxed, did a little light cleaning and light cooking.  She also did some crafts to keep busy.  (Tr. 47)  She enjoyed listening to books on her phone.  (Tr. 48)

- Cross had a high school education.  (Tr. 48)

- Cross was 5'4 and ½" and weighed 170 pounds. (Tr. 48)  She had gained forty pounds since she stopped working.  (Tr. 49)

- Cross believed that she was unable to work due to intolerable pain.  She also had migraines approximately twice a week.  (Tr. 49)

- Cross felt that she was able to lift a milk jug.  (Tr. 51)

- Cross lied around a lot.  She could only tolerate sitting, standing and walking for short periods.  (Tr. 52)  She could only walk for 25 feet.  (Tr. 53)

- Cross also had depression and anxiety and reported past sexual abuse by her brother. (Tr. 53)

- She had anxiety attacks and did not like to be around people.  She did not leave her house unless she had a doctor's appointment.  (Tr. 57)

### 2.    Vocational Expert Testimony

Vocational Expert ("VE") Daniel Simone also testified at the hearing.  (Tr. 59-63)

- The VE was asked to consider a hypothetical individual of Cross's age, education and work experience, who could perform sedentary work, would never climb ladders, ropes or scaffolds, could occasionally climb ramps or stairs, could frequently stoop, kneel, and crouch; could never crawl, use machinery or be exposed to unprotected heights or perform any commercial driving..  (Tr. 59-60)

- The VE testified that this individual could perform the work of charge account clerk, order clerk, and call-out operator.  There were significant numbers of these jobs in the national economy.  (Tr. 61-62)

- The VE testified that the maximum amount of time that a person could be off task was about 15 percent and the ordinary tolerance for absenteeism was one day per month.  (Tr. 62-63)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]….
>
> 42 U.S.C. § 423(d)(2)(A).

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

## V.    The ALJ's Decision

The ALJ's June 9, 2016 decision (Tr. 18-35) contained the following findings relevant to this appeal:

2. Cross had not engaged in substantial gainful activity since February 11, 2014, the alleged onset date.  (Tr. 23)

20

3.  Cross had the following severe impairments: fibromyalgia, ankylosing spondylitis, major depression, post-traumatic stress disorder, attention deficit hyperactivity disorder and panic disorder.  (Tr. 23)

5.  Cross had the residual functional capacity to perform sedentary work except she needed to stand every 30 minutes for 2 minutes; she could never climb ladders, ropes or scaffolds; she could occasionally climb ramps or stairs; she could frequently stoop, kneel and crouch, but she could never crawl; she had to avoid the use of moving machinery, commercial driving, and unprotected heights; she could perform simple, routine, and repetitive tasks; and her work environment needed to be free of fast-paced production requirements and routine work place changes.  (Tr. 25-33)

10. Considering Cross's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform.  (Tr. 33)

Based on his ten findings, the ALJ determined that Ms. Cross had not been under a disability from February 11, 2014, the date her SSI application was filed.  (Tr. 34)

## VI.  Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied.  If not, reversal is required unless the legal error was harmless.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was

22

discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.    ALJ's Assessment of Opinion of Cross's Counselor, Jill Jividen, M.Ed., LPCC-S

Cross argues that the ALJ improperly evaluated the opinion of her counselor, Jill Jividen, M.Ed., LPCC-S.  Cross acknowledges that Ms. Jividen was not an acceptable medical source but contends that the ALJ failed to properly evaluate her opinions as an "other source."  SSR No. 06-03p, 2006 SSR LEXIS 5, states that "other sources" are important and should be properly evaluated:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR No. 06-03p also provides factors to be applied to opinion evidence from "other sources."

These factors include:

1. How long the source has known and how frequently the source has seen the individual;

2. How consistent the opinion is with other evidence;

3. The degree to which the source presents relevant evidence to support an opinion;

4. How well the source explains the opinion;

5.  Whether the source has a specialty or area of expertise related to the individual's impairment (s), and

6.  Any other factors that tend to support or refute the opinion.

*Id.*

Ms. Jividen authored several letters in Cross's record.  The ALJ considered Jividen's opinions as follows:

> In regard to mental impairments, the only treating source was Jill Jividen, M.Ed., LPPC-S.  Ms. Jividen is not a medical doctor, psychologist nor acceptable medical source.  Treatment began in 2014, but there are no mental status examinations and no qualified medical source ever performed an evaluation.  (8E; 13F; 21F; 22F; 28F; 32F; 33F)

> Ms. Jividen reported in November 2014 that the claimant's condition improved so much in five months of counseling that she no longer needed medication and she was "no longer tied to a revolving door of various illnesses and is free of her debilitating fears… finally living the life of [her] dreams." (13F/3)  Most sessions and assessments focused on the claimant dealing with past trauma from childhood, which social worker Ms. Jividen suspected contributed to pain response as an adult.  However, Ms. Jividen did not explain how the claimant was able to work as a nurse's aide for 15 years if her body responded to stress by causing pain responses and "shutting down" since childhood.  (8E; 13F/2-4)  No acceptable medical source ever endorsed this theory.  Nonetheless, regardless of whether pain was psychological in nature, the above cited note indicating the claimant was better and "living with the life of her dreams" indicates that just a few months of treatment was extremely effective in alleviating symptoms.  Further, Ms. Jividen indicated the claimant would only require "temporary disability," and she would live a "pain free life" if she could feel financially secure with benefits.  (13F/3)

> Ms. Jividen completed a form, wherein she endorsed a complete inability to perform any aspect of socialization or concentration, persistence and pace whatsoever.  She opined the claimant would be absent four or more days per month.  (21F/1-2)  She submitted a similar form later albeit with slight improvements.  (33F)  These assessments indicate the claimant has absolutely no ability to think, remember, concentrate or interact with anyone.  These extreme allegations are wholly inconsistent with the claimant's ability to get along with family, friends and doctors and her treating specialist notes indicating [sic] normal memory.  Ms. Jividen did not provide any mental status examinations to support these extreme limitations.  Further, a person with no functioning would be expected to live in a nursing home with full-time caretakers.  However, Ms. Jividen reported the claimant was able to drive herself "at least 35 minutes" just to

24

get to counseling sessions.  She also indicated the claimant moved through treatment "much faster" than others in her position, making her an "exemplar client."  (28F/1-3)  Ms. Jividen determined that she was not qualified to provide the type of treatment needed, but it was her "intention to be trained" in neurofeedback to treat the claimant in the future.  (32F/5)

I assign little weight to Ms. Jividen's numerous assessments because they are extreme and not consistent with the claimant's ability to drive, maintain attendance at her sessions and get along with family, friends, and doctors.  These opinions are not supported by any mental status examinations.  Further, Ms. Jividen is not an acceptable medical source, and even she indicated that she lacked the proper credentials and training to offer the type of treatment the claimant needed.  Given all these factors, I assign little weight to Ms. Jividen's various notes, letters and opinions.

(Tr. 30-31)

Cross points out, and the Commissioner concedes, that the ALJ misread portions of Ms. Jividen's letters.  The ALJ seemingly placed great significance on a statement by Ms. Jividen that Cross was "living the life of her dreams."  (Tr. 30-31)  However, this statement was not about Cross.  Ms. Jividen was describing a different client as an example of the effectiveness of her treatment.  (Tr. 466)  Thus, the ALJ erred in relying on this paragraph to discredit Ms. Jividen's opinions about Cross.

Cross also correctly points out that, contrary to the ALJ's statements (Tr. 31), Ms. Jividen did not indicate that she lacked the proper credentials and training to offer the type of treatment that [Cross] needed.  Ms. Jividen stated in one of her letters that she intended to train in the area of neurofeedback so that she could offer this treatment to Cross.  She felt that this treatment might speed up the therapy process for Cross.  (Tr. 833)  However, she did not state that she lacked the proper credentials and training to treat Cross.  She was using other methods to treat Cross including "somatic experiencing, "internal family systems therapy," and EMDR therapy.  (Tr. 466)

25

The Commissioner sets forth several reasons why Ms. Jividen's opinions were not entitled to greater weight.  For example, she points out that Ms. Jividen attributed Cross's chronic pain to previous trauma and to "abnormalities in various areas of [her] brain" and/or thyroid abnormalities.  The Commissioner points out that no medical record or testing result showed any evidence of any abnormality in Cross's brain or thyroid and that Ms. Jividen was not qualified to diagnose medical abnormalities.  The problem with this argument is that the ALJ did not offer these reasons in his analysis of Ms. Jividen's opinions.  Thus, adopting such analysis would be an improper post-hoc rationalization of the ALJ's decision.  See *Williams v. Comm'r of Soc. Sec.,* 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp*., 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency.)

Ms. Jividen was an "other source" and her opinions were not entitled to controlling weight.  But the ALJ was required to consider her opinions as a medical source who was not an "acceptable medical source."  SSR 06-03p, 2006 SSR LEXIS 5.  The ALJ did not appear to have considered most of the "other source" factors listed in SSR 06-03p in relation to Ms. Jividen.  Ms. Jividen treated Cross for approximately two and a half years and typically saw her twice a week.  Ms. Jividen had a masters of education degree and was a licensed professional clinical counselor with supervision designation.  If the ALJ had properly read Ms. Jividen's letters and considered the factors related to "other sources," he may well have assigned more weight to her opinions.  Significant parts of the information he relied on to discount Ms. Jividen's opinions were inaccurate, as explained above.  Because the ALJ improperly evaluated the opinions of Cross's counselor, Ms. Jividen, I recommend that this matter be remanded for further proceedings consistent with this recommendation.

### C.    ALJ's Assessment of the Opinions of Treating Source, Dr. Atul Goswami

Cross also argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Atul Goswami.  The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source.  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record."  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion.  20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned.").  "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical

27

opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No.

96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation

marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence,

even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r*

*of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not

hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given

to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions

from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661

F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original)

(internal quotation marks omitted).

Regarding Dr. Goswami's opinions, the ALJ stated:

Primary care source Atul Goswami, MD also provided a medical source statement
in March 2014.  He indicated that the Claimant was compliant with treatment;
could sit two hours at a time; could stand one hour at a time; could walk 30
minutes to an hour; and could never bend, stoop, lift, or grasp.  (5F/2-4)  This
family physician further noted that the Claimant was unable to return to work due
to pain and difficulty lifting, pushing and pulling.  (5F/4)  Dr. Goswami
completed a second questionnaire in August 2014, wherein he noted that the
Claimant could sit two out of eight hours and needed a break every 30 minutes;
could walk one out of eight hours and needed a break every 10 minutes; and could
never bend, stoop, lift, or grasp.  (11F/2-4)  I assign partial weight to these
assessments because the recommendation for sedentary work with a sit/stand
option to shift every 30 minutes is consistent with objective findings and
clinically documented joint pain.  I do not accept allegations of an inability to lift
anything, bend, stoop, or grasp because the claimant admitted she could lift a
gallon of milk, drive (hold steering wheel), make crafts and her ability to get
in/out of a car requires some degree of stooping.  Dr. Goswami did not consider
improvements of functioning with Humira or carpal tunnel release surgeries.
Further, the issue of whether a person is disabled is reserved to the Commissioner
and the opinion that the claimant was able to return to work is not entitled to
controlling weight.  (20 CFR 404.1527(e) and SSR 96-5p).

* * *

Primary physician Dr. Goswami prescribed a handicapped placard by late 2014.
(15F/4; 26F/2)  He provided a fibromyalgia medical source statements [sic] in
January 2015.  He opined the claimant could lift up to five pounds, could use her
hands 10% of the workday, could use her fingers 10% of the workday, could
reach overhead with her arms 20% of the workday, and could reach in front of her
body with her arms 25% of the workday.  (16F1-3)  This physician further opined
that if attempting to work full-time, the Claimant would likely be off task 25% or
more of the workday and would likely miss more than four days of work per
month.  He considered the Claimant incapable of even "low stress" work.  (16F/1-
3)  Dr. Goswami completed an additional assessment in the same month, where
he reiterated many of the same limitations.  He further noted that the Claimant
would need to lie down for two hours or more throughout the workday, even if
working a sedentary job.  (17F/1-2)  I assign little weight to these assessments
because they conflict with the treatment notes and opinions of two specialists.
Specialists' notes document normal memory, normal strength, normal reflexes,
and normal range of motion, contradicting the extreme level of limitation alleged
with a handicapped placards [sic] and these assessments.  Both treating
rheumatologists recommended the Claimant remain active, which directly
contradicts the need to lie down for a significant portion of the day.  The objective
and clinical findings are not consistent with the extreme limitations proposed by
the claimant's family doctor.  Based on these conflicts and lack of specialized
training, I do not find Dr. Goswami's opinion controlling nor persuasive.  Greater
weight is afforded to the opinion of treating specialists, who endorsed a much
lesser degree of limitations.

* * *

In March 2016, Dr. Goswami submitted an additional medical source statement.
He opined that the Claimant would be limited to less than sedentary work; could
not complete a full eight-hour workday; would need to lie down two hours or
more throughout the course of a workday, even if working a sedentary job; could
use her hands about 10% of the workday; was likely to miss more than four days
of work per month if attempting to work full-time; and was likely to be off task
over 20% of the workday if attempting to work full-time.  Finally, he noted that
the Claimant was unable to work at this time.  (34F/1-2)  I assign little (non-
controlling) weight to this opinion because it is inconsistent with the clinical
findings of treating rheumatologists and pain management physicians.  There is
no indication the claimant had attendance issues with treatment, mobility issues,
or otherwise would be unable to sustain attendance.  Her normal strength,
reflexes, gait, balance and improved hand functioning after surgery are all
indicative of a greater level of functioning than this assessment provides.

A treating physician may bring bias to the disability evaluation and the possibility
always exists that a doctor may express an opinion in an effort to assist a patient
with whom he or she sympathizes for one reason or another.  Another reality

which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients' requests and avoid unnecessary doctor/patient tension.  While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion departs substantially from the rest of the evidence of records, as is the case with the assessments that family physician Dr. Goswami provided throughout the record.  A treating physician's opinion does not enjoy a presumption of correctness or controlling weight in a case such as this where evidence opposing from multiple treating sources with medical specialties was introduced.  For these reasons, Dr. Goswami's opinions are found to be neither controlling nor persuasive.

(Tr. 27-30)

The ALJ assigned little weight to the opinions of Dr. Goswami because he felt that they were inconsistent with the clinical findings of treating rheumatologists and pain management physicians.[2]  In *Friend v. Comm'r of Soc. Sec.,* 375 Fed. App'x 543, 552 (6th Cir. 2010), the court held that it "it was not enough to dismiss a treating physician's opinion as "incompatible" with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."  Here, the ALJ did not cite specific records or even name the rheumatologists and physicians whose treatment notes were inconsistent with Dr. Goswami's opinions.  He did not explain reasons building an accurate and logical bridge between the evidence and his result.  If he had pointed to specific records it would be easier to determine whether those records were inconsistent with the opinions expressed by Dr. Goswami.

There is evidence in the record of Cross consulting or treating with three rheumatologists, Dr. Hedge, Dr. Zevallos and Dr. Yao.  The ALJ correctly noted that two of these physicians recommended that Cross remain active.  (Tr. 329, 535)  However, it is unclear whether these

---

[2] The Commissioner also argues that Dr. Goswami's opinions were inconsistent with his own treatment notes and with specific treatment notes from the pain clinic.  However, this is another attempt at *post hoc* rationalization because the ALJ did not cite any specific treatment notes in support of his assigning little weight to Dr. Goswami's opinions.  *See Williams,* 227 F. App'x at 464.

recommendations were actually inconsistent with the opinions expressed by Dr. Goswami in the questionnaires he completed. The rheumatologists did not complete comparable medical source statements.[3] So, even though they recommended that Cross stay active or participate in aerobic exercise, they may still have opined that she had functional limitations - such as that she was incapable of sitting for long periods without breaks. Moreover, Cross only had one appointment with both Dr. Zevallos and Dr. Yao. They did not have the same longitudinal relationship with her as did her treating physician, Dr. Goswami. Nonetheless, the ALJ assigned greater weight to the treatment notes of the rheumatologists (two who met with Cross only once) than he did to her treating physician. (Tr. 28-29)

Making generic references to the records of specialists who expressed mixed opinions neither identifies an "inconsistency with the record as a whole" nor an inconsistency with that opposing physician's views in particular. Here, the ALJ failed to build a logical bridge between his decision and the medical evidence. The purpose of the "good reasons" requirement is two-fold. First, a sufficiently clear explanation, "lets the claimants understand the disposition of their cases," particularly where a claimant knows that her physician has deemed her disabled and therefore "might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Rogers,* 486 F.3d at 242 (quoting *Wilson* 378 F.3d at 544). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."

---

[3] Dr. Hedge completed a short questionnaire in March 2014. She indicated that Cross was not limited in motion in her joints and/or spine; she was able to do fine manipulation, but may be limited in gross manipulation by pain. She also indicated that Cross recently started a prescription that may provide relief. However, no later records from Dr. Hedge appear in the record. She may have changed her opinions if Cross had continued meeting with her. Conversely, Dr. Goswami's opinions were updated in 2015 and 2016.

*Wilson*, 378 F.3d at 544.  In this case, the ALJ failed to provide a sufficiently clear explanation for assigning little weight to Dr. Goswami's opinions.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may be "harmless error."  These circumstances are present when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though he has not complied with the terms of the regulation.  "*Wilson,* 378 F.3d at 547.  *See also Cole,* 661 F.3d at 940.  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.  *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. App'x 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. App'x 456, 464 (6th Cir. 2005); *Friend,* 375 Fed. App'x at 551.  "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused."  *Id.*

Here, the ALJ's stated reasons for rejecting the opinion of Cross's treating physician were inadequate.  He did not identify specific records that supported his decision to assign little weight to Dr. Goswami's opinions, and he did not express himself in such a way that we can know that he fully considered all of the elements contemplated by 20 C.F.R. § 416.927(c)(2)-(6). I find that the ALJ's failure to provide sufficiently specific "good reasons" for rejecting Dr. Goswami's opinion regarding Ms. Cross's limitations was not harmless error.  Even if good

reasons existed to reject Dr. Goswami's opinions, the ALJ failed to articulate those reasons with sufficient specificity to allow for meaningful review.  The court should reject the ALJ's determination.

**VII.    Recommendation**

Because the Commissioner's decision were not supported by substantial evidence, I recommend that the final decision of the Commissioner be VACATED and that the matter be REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.


Dated: June 13, 2018

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**